No. 3206

Second Circuit

CORLEY v. HILL, HARRIS & COMPANY, INC.

(June 28, 1928. Opinion and Decree.)

*(Syllabus by the Court)*

1. **Louisiana Digest—Builders and Buildings—Par. 24; Estoppel—Par. 37, 41; Obligations—Par. 160, 165.**

Mere failure on the part of one for whom another has constructed a residence to complain of defective construction, where such delay is not unreasonably long and has not disadvantageously affected the builder, will not work an estoppel against such owner to claim damages for improper building.

Castleman vs. Smith, 148 La. 241, 86 So. 778.

Breaux vs. Hanson Lumber Co., 125 La. 241, 51 So. 444.

Borrosky vs. Hill, Harris & Co., 1 La. App. 431.

2. **Louisiana Digest—Builders and Buildings—Par. 8; Obligations—Par. 165.**

If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin, either in whole or in part, on account of the badness of the workmanship, the archi-

tect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks.

Civil Code, Article 2762.

Appeal from the Ninth Judicial District Court, Parish of Rapides. Hon. R. C. Culpepper, Judge.

Action by Walter B. Corley against Hill, Harris & Company, Inc.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

White, Holloman and White, and Gus A. Voltz, of Alexandria, attorneys for plaintiff, appellee.

H. W. Hill, of Alexandria, attorneys for defendant, appellant.

STATEMENT OF THE CASE.

REYNOLDS, J. Plaintiff sues defendant for $662.40 with 8% per annum interest thereon from December 21, 1921, until paid. He alleges that on December 21, 1921, he and defendant entered into a contract whereby the latter was to erect him a dwelling house according to certain plans and specifications and for an agreed price, and that according to the specifications the material to be used was to be good and serviceable and the work substantial and workmanlike; that the building was constructed by defendant and delivered to him and he entered into possession and occupation thereof on March 23, 1923.

He further alleges that—

"* * * shortly thereafter and during the first rain the entire roof leaked because of defective materials and improper workmanship in the application thereof and

poor workmanship in the construction thereof; that the water soaked through the roof and the porches, necessitating the placing of receptacles in an attempt to prevent the water falling upon the floors; that the paper on the walls and ceilings in the rooms was ruined.

"That plaintiff at once notified defendant and defendant attempted to repair the roof but without success; that the leaks constantly became more numerous, and defendant has made numerous attempts to repair the leaks, the last attempt being on or about June 15, 1926, but without success; that because of said leaks the water has found its way under the flooring in the living room and dining room and has caused the floors to warp and the subfloors to decay, rendering the use of said rooms unlivable in their present condition and necessitating the replacing of the floors with new material."

He further alleges that defendant specially guaranteed the roof against leaking for a period of ten years.

Plaintiff itemizes his damages as follows:

| | |
|---|---|
| Estimated cost of replacing the roof | $330.00 |
| Replacing floors in living room and dining room | 272.40 |
| Repapering living room, dining room and one bedroom | 60.00 |
| Total | $662.40 |

Defendant filed an exception of no cause of action, which was referred to the merits.

Thereupon defendant answered, pleading the prescription of one year under Article 2534 of the Civil Code, denying that either the material or workmanship used in the construction of the roof was defective, denying that the alleged damage to the roof, floors or paper on the walls was caused by a leak or leaks in the roof, and alleged that the leak in the roof was not the result of defective material or workmanship but of the design of a flue called for by the plans and specifications according to which the house was built and which plans and specifications were provided by plaintiff and for which plans and specifications defendant was in no manner responsible.

Defendant further alleged that although not responsible for the leaks or the damage resulting therefrom, it had, at plaintiff's request, made certain alterations to the building at its own expense, and that thereafter the plaintiff expressed satisfaction with the building and again accepted it and that plaintiff is now estopped to assert his alleged cause of action.

And defendant further alleged that if it was responsible for the leaky roof it was plaintiff's duty to endeavor to have the same repaired as soon as it was discovered and thereby to minimize the damage it caused him and that plaintiff made no effort to have the roof repaired or to minimize his damage and in consequence if defendant is liable at all it is only for such as would necessarily have remained after proper effort to minimize the loss.

On these issues the case was tried and there was judgment in favor of the plaintiff and against the defendant for $662.40 with 5% per annum interest thereon from judicial demand and the defendant appealed.

Plaintiff has answered the appeal and asks that the rate of interest on the judgment be increased from 5% to 8%.

## OPINION

The first question to be determined is whether the roof leaked or not and if it did whether the leak was the result of defective construction.

That the roof did leak and that the leak was the result of faulty construction is established, we think, by the testimony of plaintiff and his wife and six other of his witnesses and by the testimony of

H. H. Harris, who is connected with the defendant company.

H. H. Harris testified:

"Q. Did you go out personally to look at the house?
"A. No, sir.
"Q. Send anybody out to look it over?
"A. Yes, sir.
"Q. They found some defects?
"A. Yes, sir.
"Q. They found it leaked?
"A. Found it had been leaking.
"Q. You attempted to repair it at that time?
"A. We did repair it."

And that the leaky condition of the roof was caused partly if not wholly by bad workmanship in construction appears by the testimony of Mr. E. Leo Ball, an architect, who testified:

"Q. You examined the roof?
"A. Yes, sir.
"Q. Please state what condition you found the roof to be in?
"A. The roof over the porte cochere and porch was in very bad condition. The roof on the main part of the house was improperly applied by using nails which were unsuitable for the purpose.
"Q. What kind of nails were used, Mr. Ball?
"A. It looked to me like three-penny common shingle nails, and then again some of them were the large head nails, and then others seemed to be the medium size nails, which looked to me like should be used to apply roll roof rather than individual shingles.
"Q. You say the roof was incorrectly applied?
"A. Yes, by the use of improper nails.
"Q. Well, in regard to the lapping of the shingles, the lay of these shingles?
"A. They seemed to be too far apart. The space shouldn't have been over a quarter of an inch and in some places an inch some three-quarters—maybe one-half inch.
"Q. In your opinion, would the improper placing of those shingles permit leaks in the roof?
"A. Oh, yes.

"Q. In your opinion were the proper nails used to apply the shingles with?
"A. I don't think so.
"Q. Please state why not?
"A. Because the nails were not the proper kind. They were little small headed nails which, of course, when the contraction and expansion from heat and cold left the shingles the head of the nail would go right through the paper, and of course left the shingles unnailed.
"Q. With what effect?
"A. It caused leaks with the shingles getting away from the roof.
"Q. Did you find that condition to exist in one spot or all over the roof?
"A. Every place I could see it seemed to exist.
"Q. You inspected the entire roof?
"A. Yes, sir.
"Q. Mr. Ball, in your opinion, could that roof in that condition be repaired?
"A. I don't think so.
"Q. In your opinion, Mr. Ball, what would have been the only way to have placed that roof in a condition so it wouldn't leak?
"A. Put on a new roof.

* * *

"Q. Mr. Ball, did you make an inspection of the floors and subfloors and materials in the house?
"A. Yes, sir.
"Q. Please state to the court what condition you found those floors and the interior of the house in general, and the cause of the condition you found?
"A. The place where I examined, I could dig up the shiplap and subfloors and some joists with my fingers, showing that it had completely rotted out.
"Q. From what cause, in your opinion?
"A. It looked to me like wet rot.
"Q. How, in your opinion, did that happen?
"A. Well, it looked to me like only one way it could become wet, and that's from water coming from above.
"Q. Please state whether those walls were rotten from the bottom or top?
"A. From the top. The one sill I examined was rotten on top and not on the bottom, showing the water had been standing on the top of the sill.
"Q. Now, Mr. Ball, did you examine the floor in the closet?

"A.   I did.

"Q.   What was the condition of that?

"A.   When I examined it there wasn't any in there.

"Q.   What had become of it?

"A.   It had rotted out.   I could pull it out with my hand."

Mr. Ball's testimony is corroborated and strengthened by that of R. A. Couvillion, E. N. Warner, M. Bize and W. R. Smith.

We think the repairs were necessary and were made necessary by the leaky roof and that plaintiff was warranted in having them made and his testimony shows that they cost him even more than the sum he sues for.

Defendant contends that by accepting the house originally and again after it had made repairs thereto on plaintiff's complaint plaintiff estopped himself to assert his present claim; and defendant cites the cases of Matthews vs. Rudy, 4 La. App. 226, and DeLambre vs. Williams, 36 La. Ann. 330.

Where defects are not latent or are of minor importance acceptance of the work may discharge the builder from responsibility in the absence of an agreement to the contrary; but we do not consider the defects in the construction of plaintiff's house either latent or of minor importance.   To have discovered that the roof was faultily constructed plaintiff would have had to get upon it and even had he done that he would not have discovered it as he is not an expert in such matters.   He could only discover it after a rain on the house and the roof did leak upon the first rain and plaintiff at once reported it to defendant and thereafter defendant made repeated attempts to repair the roof and failed to stop it from leaking. The reason he failed was doubtless because, as testified to by Mr. Ball, the only way it could be repaired was to remove it entirely and replace it with a new roof.   As a builder, defendant is presumed to have known this, and plaintiff, by accepting the house originally and again after defendant had made what he supposed were the necessary repairs, in no way prejudiced any right defendant may have had in the premises or made it change its position to its detriment, and therefore plaintiff was not estopped thereby to prosecute this action.

Neither is defendant's plea of the prescription of one year good.   The prescription applicable to a case of this kind is that of five years under Article 2762 of the Civil Code which provides that—

"If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built with wood or with frames filled with bricks."

The building was completed by defendant and delivered to plaintiff on March 23, 1923, and this suit was filed January 10, 1927, and therefore the five-year prescription had not run.

Under the law and the evidence the plaintiff is entitled to judgment.

Plaintiff insists that he is entitled to 8% instead of 5% on the amount of the judgment from judicial demand.   He has not cited us any authority in support of his contention and we know of none.

We find no error in the judgment appealed from and accordingly it is affirmed.